# IN THE UNITED STATES DISTRICT COURT
# FOR THE TENTH CIRCUIT IN KANSAS

| | |
|---|---|
| **K. K. INGRAM** ) <br> 2001 NW Chipman Rd. ) <br> Lee's Summit, MO 64081 ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **UNITED BIOSOURCE CORPORATION (UBC)** ) <br> **(A/K/A AVISTA CAPITAL PARTNERS AND** ) <br> **D/B/A UNITED BIOSOURCE LLC)** ) <br> 12900 Foster ) <br> Suite 300 ) <br> Overland Park, KS 66213 ) <br> ) <br> Serve: Registered Agent **)** <br> Corporation Service Company **)** <br> 2900 SW Wanamaker Drive **)** <br> Topeka, KS 66614 **)** <br> ) <br> **Defendant.** ) | Case No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.   Preliminary Statement

1. COMES NOW, Plaintiff K. K. Ingram, by and through her attorneys of record, Kevin Baldwin, Eric Vernon, Sylvia Hernandez and Robin Koogler of Baldwin & Vernon, LLC., and brings this federal Complaint for Damages against United BioSource, Corporation, (AKA Avista Capital Partners and d/b/a United Biosource LLC doing business in Kansas, Missouri and Pennsylvania under that name) (hereinafter referred to collectively as "Defendant Company"). This action seeks declaratory, injunctive and equitable relief, actual, compensatory and punitive damages, and costs under Kansas Common Law and/or alternatively, for recovery of damages and

1

costs (liquidated damages as opposed to punitive damages) under the extra-territorial claims under the Missouri Whistleblower Protection for Defendants' conduct and actions taken against Plaintiff.

### II.  Jurisdiction

2. Plaintiff is alleging claims of wrongful termination and retaliation under Kansas common law for wrongful termination, and alternatively under Pennsylvania's Whistleblower laws and/or the Missouri Whistleblower Protection Act, based upon Plaintiff's reporting and objecting to what she believed to be Defendant's violation of federal regulations and Plaintiff being directed to violate the federal laws against wire fraud for transmitting knowingly false information to mislead and/or defraud a client company and/or federal agency via electronic submissions and means.

3. Jurisdiction and venue are invoked pursuant to 28 U.S. Code §1332 *et. seq.*, as the Plaintiff and Defendants are citizens of different states.

4. The Plaintiff, based upon reasonable belief at this time absent discovery, indicates that the amount of compensatory and/or special damages in controversy is in excess of $75,000.00; in addition, Plaintiff seeks declaratory, injunctive and equitable relief, as well as punitive damages under Kansas Common Law, or in the alternative, Pennsylvania Law and/or the Missouri Whistleblower Protection Act.

### III.  Venue

5. This action properly lies in the Federal District Court of Kansas in the 10th Circuit because the claim arose in this judicial district, and because unlawful employment practices in

violation of Kansas Common law were committed in accordance with Plaintiff's work at the Defendants' facilities in Overland Park, KS.

IV. **Parties**

6. Plaintiff is a resident of the United Stated residing at 2001 NW Chipman Rd. Lee's Summit, MO 64081 and is a Missouri resident.

7. Defendant United BioSource, Corporation (UBC), (a/ka/a Avista Capital Partners which is the private equity firm that purchased United Biosource LLC and doing business under that name) hereinafter referred to collectively as "Defendant Company" is an employer engaged in an industry affecting commerce, and, upon information and belief, employs more than 500 regular employees and is a resident of the State of Pennsylvania doing business in the Kansas Judicial District. Defendant Company is a corporation, (containing within its charter the requisite authority to sue and be sued), and does business in this judicial district, doing business at various locations including 12900 Foster, Suite 300, Overland Park, KS 66213 (the location to which Plaintiff reported) and further has a home office at 920 Harvest Drive in Blue Bell, Pennsylvania 19422. Defendant Company is an employer under Kansas law and Defendant Company is subject to Kansas' prohibition on wrongful termination of an employee for engaging in Whistleblowing by opposing acts in violation of State and/or Federal laws and regulations by Defendant Company by Defendant's executives, managers and supervisors.

V. **Facts Common to all Counts**

8. Plaintiff, K. Ingram, was hired by Defendant Company as a permanent employee on or about Monday November 28, 2011 to work out of its location in Overland Park, Kansas.

9. Plaintiff was previously a temp/contractor for Defendant Company.

10. In 2018, Defendant Company made the decision to get a new Learning Management System (LMS).

11. Plaintiff and Defendant Company reviewed several vendors before finally coming to a decision to purchase SumTotal LMS.

12. The new SumTotal LMS was named "L.E.A.D. Academy".

13. In October of 2018, the commercial side of Defendant Company began using the new L.E.A.D Academy LMS.

14. The clinical side of Defendant Company would not be able to utilize the new LMS for some time as it is required to function within a validated environment (as per 21 CFR Part 11).

15. In October of 2019, the L.E.A.D. Academy validation was complete, and the system was now 21 CFR Part 11 compliant.

16. In Spring of 2020, Julie Kozlowski was hired as a QA Director for Defendant Company at about the same time that COVID began to relegate people to working from home as opposed to coming into physical office locations.

17. Ms. Kozlowski would eventually take over for the entire QA Department of Defendant Company.

18. On or about November of 2020, Ms. Kozlowski became Plaintiff's boss.

19. On or about December of 2020, Ms. Kozlowski sent a meeting invite for monthly team meetings.

20. The invite sent by Ms. Kozlowski encouraged employees to drink alcohol during company time.

21. It is Plaintiff's understanding that the Employee Handbook states that it is forbidden to drink alcohol while on company time.

22. Plaintiff reported Ms. Kozlowski to Human Resources by sending an email.

23. Ida Pranger, Defendant Company's Senior Director of HR, reached out to Plaintiff to discuss Ms. Kozlowski's inappropriate behavior.

24. After Plaintiff's meeting with Ms. Pranger, Ms. Kozlowski began retaliating against Plaintiff due to Plaintiff having made the complaint about her to HR.

25. Ms. Kozlowski started to make false implications and accusations about Plaintiff's work performance on top of harassing Plaintiff about her work schedule.

26. On or about February 17, 2021, Plaintiff met with Ms. Kozlowski regarding Plaintiff's performance evaluation.

27. Ms. Kozlowski evaluated Plaintiff performance for the entire year of 2020, even though Julie was Plaintiff's supervisor for approximately a month and a half.

28. Plaintiff was shocked and appalled by what Ms. Kozlowski said about her during the performance evaluation.

29. Plaintiff did not have any bad marks within her HR/employee file prior to the evaluation with Ms. Kozlowski.

30. Plaintiff was always known as an upstanding employee and a hard worker.

31. Ms. Kozlowski implied that Plaintiff was willfully and purposely withholding knowledge and was not a team player nor willing to work with any of the Commercial group.

32. In February/March of 2021, Plaintiff reported Ms. Kozlowski's false accusations to Ida Pranger (Senior Director of HR).

33. Plaintiff even showed Ms. Pranger the information contained within her performance review and how it was filled with lies and false accusations/implications.

34. Plaintiff was informed by Ms. Pranger that Ms. Kozlowski had done/was doing nothing wrong.

35. On or about July 20, 2021, Plaintiff received an email within the L.E.A.D Academy Mailbox.

36. The email was sent by Lara Castano Freeman and mentioned how Julie Kozlowski had resigned her position at Defendant Company last week.

37. In July of 2021, Ms. Kozlowski scheduled a disciplinary meeting with Plaintiff and Ida Pranger.

38. Plaintiff would later discover that the meeting was scheduled after Ms. Kozlowski had already resigned from her position with Defendant Company.

39. On or about July 23, 2021, Plaintiff attended the meeting with Ms. Kozlowski and Ms. Pranger.

40. Plaintiff was informed that she was being placed on a "final written notice" based upon Plaintiff's "misconduct" as alleged by Ms. Kozlowski.

41. The basis of the disciplinary action, which was false and Ms. Kozlowski's partying gift to Plaintiff before she left the company, said that Plaintiff disrespected her (Ms. Kozlowski) by copying her boss on an email and that Plaintiff's behavior would not be tolerated anymore at Defendant Company.

42. Ms. Kozlowski further stated that Plaintiff was disrespectful in her tone of the email and that Plaintiff did not adhere to or exhibit Defendant Company's core values.

43. On or about July of 2021, Alex Loboda was hired to replace Ms. Kozlowski.

44. In August of 2021, Mr. Loboda scheduled a meeting with Jeff Glaubke and Plaintiff.

45. Mr. Loboda would ask questions, but any time Plaintiff and/or Glaubke would try to speak, Mr. Loboda would immediately speak over Plaintiff and Mr. Glaubke.

46. Plaintiff spoke with Melissa Campanelli (Patrick Lindsay's Senior Executive Assistant) about her concerns with Mr. Loboda and issues Plaintiff had with Julie Kozlowski.

47. Plaintiff stated that Mr. Loboda didn't understand the importance of 21 CFR Part 11 in regard to the L.E.A.D. Academy validation.

48. Plaintiff felt from her conversation with Melissa that she would make sure Patrick Lindsay would receive the information.

49. Plaintiff received an email from Senior Vice President, Natalie O'Donnell, informing Plaintiff that she had been on a call with Patrick Lindsay regarding her concerns.

50. Plaintiff informed Natalie of her past incidences with Ida Pranger and Julie Kozlowski.

51. Plaintiff also told Natalie of her concerns with the recent hire, Mr. Loboda.

52. Plaintiff shared what Mr. Loboda was intending to do at Defendant Company and how that would damage Defendant Company, since everything in QA has a direct effect on audits, clients, and the FDA requirements and submissions.

53. On or about August 16, 2021, the Aurinia audit began.

54. Tanya Johnson was asked to pull training reports for four employees: Stephanie Hubbard, Jeff Ramage (Senior VP and General Counsel), Rebecca Richardson, and Cheryl Woods.

55. After the reports were pulled, Mr. Loboda noticed that Jeff Ramage and Stephanie Hubbard had overdue trainings (which would put them out of compliance).

56. This would be considered a minor audit finding once the client reviewed the reports. This would mean that the deficiencies would be included on the audit report and could threaten the validity of the testing and/or the desire of the client to use Defendant Company if not addressed properly.

57. Mr. Loboda was aware of this and reached out to Tanya Johnson and asked her to provide him with a report that only shows "Completed" courses. This would mean omitting an important fact on the audit that was not only to be provided to the client, but also as part of the information submitted to the FDA as part of a drug trial.

58. Mr. Loboda was asking Tanya to remove the "Overdue" courses from the audit so the client would not receive that information, would not question the deficiency, and would therefore not have to include the deficiency as part of the information being provided to the FDA which could interfere with FDA approval.

59. Tanya Johnson informed Mr. Loboda she could not do that since Defendant Company's reports are not configured in that manner and did not have the appropriate access to do so.

60. Plaintiff was then contacted by Mr. Loboda asking Plaintiff to do the exact same thing.

61. Plaintiff was expecting Mr. Loboda to ask this of her since Tanya Johnson had already alerted and informed Plaintiff of the situation.

62. Plaintiff explained to Mr. Loboda that she understood what he was asking but stated she could not do that since the information he was asking to have removed and unreported was required.

63. Mr. Loboda continued to persist in asking Plaintiff to change the audit to remove the noted deficiencies so that the client and FDA would be unaware of them.

64. Plaintiff informed Mr. Loboda of her unwillingness to do that, stating to him: "*That is fraud and illegal behavior, and I am not doing it*!" Plaintiff further stated, "*If you do that at UBC* (Defendant Company), *you will get fired and we will get major audit findings*."

65. Plaintiff based her belief not only on Defendant's Code of Conduct and Policy Manual, but upon her understanding of the requirements of those audits to be submitted as part of the process by which a company seeks approval of drugs and drug trials through the Food and Drug Administration (FDA).

66. Plaintiff was also concerned that by submitting false information regarding the audits to the client and then to the FDA might constitute criminal wire fraud as a federal crime that involves any scheme to defraud another person or party by means of electronic communication.

67. Mr. Loboda continued to disagree, and Plaintiff reiterated that she would not do it and would be reporting him to Management.

68. Plaintiff emailed Natalie O'Donnell to inform her of Mr. Loboda's actions.

69. Natalie O'Donnell responded to Plaintiff's email assuring her that Defendant Company does not want them to commit fraud and "thanked" Plaintiff for reaching out.

70. Of course, contrary to Plaintiff's prior training and understanding of the alleged ethical practice of the company, it was not Mr. Loboda who was terminated for seeking to have

the information withheld and false submission made, it was Plaintiff who would be terminated for reporting the incident and warning others of the potential ramifications for such violations.

71. On or about August 18, 2021, Plaintiff attended a meeting with Tanya Johnson, Jeff Ramage (Senior VP and Legal Counsel), Mr. Loboda, and Yovanka Djovic.

72. The purpose of the meeting was for Plaintiff and Tanya Johnson to explain their use of the work "fraudulent" and "illegal".

73. Despite his legal education and standing as Defendant's legal counsel, Mr. Ramage feigned that he was not understanding Plaintiff and Tanya Johnson's use of the words "fraud" and "illegal" in the context of changing the audit to remove his and another executives deficient training status.

74. Ironically, based upon the information at the time, Senior VP and Legal Counsel Jeff Ramage had not completed his "Annual Fraud" training nor his "Fraud SOP" training.

75. Mr. Ramage was also noncompliant with the CAPA SOP training and several others.

76. At this time, Jeff Ramage was not only Senior VP and Legal Counsel, but had also been installed as the head of QA. As such, Mr. Ramage should have been aware that a large part of that position is to make sure that his training is completed in a timely manner and to be "audit-ready" at all times.

77. Plaintiff informed everyone that she had invited Natalie O'Donnell to attend the meeting and that Ms. O'Donnell was well aware of the events that had taken place.

78. Plaintiff expressed her deep concern with Mr. Loboda not understanding the importance of providing a full and complete report to an auditor.

79. Mr. Ramage appeared to be defensive and stated that he planned to call Ms. O'Donnell to speak with her about the matters.

80. On or about August 19, 2021, Plaintiff received an email from Jeff Ramage addressed to her and Tanya Johnson with Ida Pranger (Senior Director of HR) copied on the email.

81. In the email, Mr. Ramage informed Ms. Pranger of the events that had taken place that week.

82. Mr. Ramage stated that Plaintiff's and Tanya's "accusations" of "fraud", "illegal behavior" and "fraud by omission" were false and unfounded.

83. Mr. Ramage also mentioned that it was inappropriate for Plaintiff and Tanya to accuse Mr. Loboda of such things and that Defendant Company takes such accusations seriously.

84. On or about August 20, 2021, Plaintiff attended a meeting with Jeff Ramage, Senior VP and Legal Counsel for Defendant Company, and Ida Pranger, Senior Director of HR for Defendant Company.

85. Plaintiff was informed that her employment with Defendant Company was being terminated since she had previously received an unrelated final written warning letter on July 23, 2021. At the time, Plaintiff was assigned to work from the Kansas location, but was working remotely from her home in Missouri.

86. Plaintiff never received any of the three prior warnings as referenced within the final written warning letter and, as such, they were simply pre-text for creating reasons to terminate her illegally.

87. Plaintiff believes that the decision to terminate her employment was because she reported Mr. Loboda's request to her supervisors (including Defendant Company's Legal Counsel) for her and Ms. Johnson to change the audit submission to remove deficiencies and

thereby commit an act of fraud and deception and potentially a criminal act of the same document and information was submitted to the FDA as part of the drug trial and drug approval process.

88. During his sworn testimony at Plaintiff's unemployment hearing, Mr. Ramage testified that Plaintiff's complaints about what she believed to be a request to engage in "fraud" and deception in the submission of audit information motivated Defendant Company to terminate Plaintiff's employment.

89. Despite claiming that changing the audit may not truly be considered "fraud", Mr. Ramage has testified under oath that, "*In talking to some other individuals, we ultimately produced the training records to this client in the traditional format.*" These were the records that Plaintiff had been asked and then ordered to alter to remove the information showing that there was deficient training.

90. As a result of her termination, Plaintiff has suffered damages in the form of lost wages and benefits which she had previously earned while employed by Defendant Company.

91. Defendant's wrongful termination of Plaintiff has caused her to suffer the emotional distress and anxiety ordinarily associated with the loss of her employment, income and status in the professional community.

92. Defendant Company's actions, by and through its executives, managers and supervisors was done with an evil motive and/or reckless disregard for the rights of the Plaintiff to be free from retaliation for having complained of what she believed to be a violation of Federal Laws and Regulations related to the testing and submission of drug trials to client companies and the FDA and that by changing the information as requested by her management, that both she and company could be in violation of those laws and regulations as well as engaged in potential federal criminal wire fraud.

93. As a further means of retaliation, Defendant Company, by and through the actions of Senior VP and Legal Counsel Jeff Ramage, opposed Plaintiff's application for unemployment benefits by claiming that Plaintiff was terminated for misconduct based upon her complaining of what she believed to be an illegal and/or unethical act.

## COUNT I
## WRONGFUL DISCHARGE IN VIOLATION OF KANSAS PUBLIC POLICY: <u>WHISTLEBLOWING</u>

94. Plaintiff hereby incorporates by reference all previous paragraphs alleged herein.

95. As demonstrated above, during her employment with Defendant Company, Plaintiff raised issues with Defendant Company's officers, executives, managers and supervisors actions and requests which she believed constituted fraud, deceit by omission, and potential criminal wire fraud after she was asked to change, alter and or amend audit reports which were requested by Clients for submission to a Federal Agency (the Food and Drug Administration) as part of their drug trial and approval process.

96. Plaintiff's first opposition to engage in the activities she believed were fraudulent were ignored by members of Defendant Company's management, necessitating Plaintiff to warn others within in her area of concern of a potential fraudulent action by sending emails, which copied her supervisor, Sr. VP and Legal Counsel Jeff Ramage. [See emails from Plaintiff Ingram warning of fraud attached hereto as Exhibit A and hereby fully incorporated as if set forth herein.]

97. Based upon information and belief, the request of Defendant Company's employee/consultant and/or manager to change the audit information was a violation of 21 CFR Part 11.  **21 CFR Part 11 Compliance focuses on six critical areas:**

- Impact of 21 CFR Part 11 on the client's computer systems, including Quality Management Systems
- Identification of the client's computer systems and operating environment
- Hosting and interpretation of user interviews

- Review and consideration of client procedures
- Analysis of procedural documentation, validation, and audit data
- Regulatory significance of the computer systems

98. Defendant Company, by and through the actions of Sr. VP and Legal Counsel Jeff Ramage, in conjunction with Sr. Director of HR Ida Pranger, terminated Plaintiff's employment and that termination was motivated by Plaintiff's report of what she believed to be fraud and/or an illegal act of altering training information on an audit requested and used by a client for compliance with FDA regulations.

99. Kansas public policy supports employees who alert their employers of potential fraud and/or illegal activities in violation of state or federal laws and/or regulations.

100. Plaintiff's termination for reporting what she believed to be a fraudulent act violates the public policy of the State of Kansas.

101. Defendant's actions have directly and proximately caused the Plaintiff substantial economic loss, and damage to her career and professional reputation, humiliation, mental stress, anxiety and emotional suffering.

102. Defendant's actions were wanton, reckless and/or willful disregard of Plaintiff's legal rights and were motivated by evil motive and/or actual malice.

103. WHEREFORE, Plaintiff K.K. Ingram asks that the Court enter judgment in her favor on Count I, finding that she was terminated in violation of Kansas public policy; for actual damages for past and future lost compensation and benefits including, without limitation, other lost benefits due to Defendant's wrongful discharge of Plaintiff, as well as pre-judgment and post-judgment interest; for an award of front pay in a reasonable amount; for all non-pecuniary compensatory damages in an amount to be proven at trial; for punitive damages; for her cost of litigation; and for such other relief as this Court deems just and proper.

## COUNT II
## WRONGFUL DISCHARGE IN VIOLATION OF KANSAS PUBLIC POLICY: REFUSAL TO ENGAGE IN AN ILLEGAL ACTIVITY (WIRE FRAUD)

104. Plaintiff hereby incorporates by reference all previously alleged paragraphs.

105. As previously alleged, Defendant Company requested that Plaintiff change, alter and/or amend certain audit information regarding training deficiencies that she believed were required by FDA Regulations.

106. Plaintiff refused to change the audit information that was to be provided to Defendant Company's client in an electronic communication and then submitted electronically and/or U.S. Mail to a Federal Agency (Food and Drug Administration).

107. Plaintiff expressed her concerns to Defendant Company that by altering the audit to be communicated to their client and then to the FDA via electronic means and/or U.S. mail would constitute a federal criminal act by Plaintiff and/or Defendant Company.

108. Wire Fraud is prohibited under 941.18 U.S.C. §1343, which sets forth the key elements of wire fraud: "1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; 2) that the defendant did so with the intent to defraud; 3) that it was reasonably foreseeable that interstate wire communications would be used; and 4) that interstate wire communications were in fact used."

109. Based upon the previously alleged facts, Plaintiff objected to altering the audit as requested by Defendant Company as she was concerned that the she would be participating in scheme to defraud the client into believing that Defendant Company was compliant; that the alteration of the audit was being done with the intent to mislead and/or defraud the client and subsequently the FDA; it was reasonably foreseeable that the altered non-compliant audit would be used by Defendant Company and subsequently by its client in submissions to the FDA in

15

support of its drug trials in seeking approval of the drug; and finally that either the U.S. Mail and/or more likely the internet would be used to electronically communicate the altered audit information.

110. Kansas Public policy supports the right of an employee to refuse to violate the law on behalf of or at the direction of an employer.

111. Plaintiff's termination for refusing what she believed to be an illegal act violates the public policy of the State of Kansas.

112. Defendant's actions have directly and proximately caused the Plaintiff substantial economic loss, and damage to her career and professional reputation, humiliation, mental stress, anxiety and emotional suffering.

113. Defendant's actions were wanton, reckless and/or willful disregard of Plaintiff's legal rights and were motivated by evil motive and/or actual malice.

114. WHEREFORE, Plaintiff K.K. Ingram asks that the Court enter judgment in her favor on Count II, finding that she was terminated in violation of public policy; for actual damages for past and future lost compensation and benefits including, without limitation, other lost benefits due to Defendant's wrongful discharge of Plaintiff, as well as pre-judgment and post-judgment interest; for an award of front pay in a reasonable amount; for all non-pecuniary compensatory damages in an amount to be proven at trial; for punitive damages; for her cost of litigation; and for such other relief as this Court deems just and proper.

**COUNT III**
**(PLEADING IN THE ALTERNATIVE)**
**WRONGFUL TERMINATION IN VIOLATION OF**
**MISSOURI WHISTLEBLOWER PROTECTION ACT**

115. Plaintiff hereby incorporates by reference all previously alleged paragraphs.

116. Pursuant to §285.575.2(4), Plaintiff is a "protected person" in two categories as she was "*an employee of an employer who reports to his or her employer serious misconduct of the*

16

*employer that violates a clear mandate of public policy* as articulated in a constitutional provision, statute, or regulation promulgated under statute; or *an employee of an employer who has refused to carry out a directive issued by his or her employer that if completed would be a violation of the law*."

117.    Pursuant to §285.575.2(2), Defendant UBC is an employer subject to the laws of the State of Missouri.

118.    Plaintiff's protected classification in reporting a violation of the misconduct of Mr. Loboda and/or her refusal to commit wire fraud by transmitting fraudulent document submissions to a client and/or the FDA were motivating factors in Defendant UBC's decision to terminate Plaintiff's employment.

119.    It is an unlawful employment practice for an employer to discharge an individual defined as a protected person in this section because of that person's status as a protected person.

120.    WHEREFORE, Plaintiff KK Ingram asks that the Court enter judgment in her favor on Count III, finding that she was terminated in violation of the Missouri Whistleblower Protection Act; for actual damages including back pay and benefits including, without limitation, other lost benefits due to Defendant's wrongful discharge of Plaintiff, as well as pre-judgment and post-judgment interest; for an award of front pay in a reasonable amount; for all non-pecuniary compensatory damages in an amount to be proven at trial; for liquidated damages as allowed by the Whistleblower Protection Act if proven by clear and convincing evidence; for her cost of litigation; reasonable attorneys as allowed under the statute, and for such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff K.K. Ingram hereby requests a trial by jury on all claims in her Complaint that may properly be submitted to a jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff Designates Kansas City, Kansas as the place of trial of this matter.

Respectfully submitted,

Baldwin & Vernon, LLC.

/s/ *Kevin Baldwin*

Kevin Baldwin, KS. Bar No. 18637
Eric Vernon, KS Bar No.
Sylvia Hernandez, KS Bar No.
Robin Koogler, KS Bar No.
108 S Pleasant St.
Independence, MO 64050
Tel: (816) 842-1102
Fax: (816) 842-1104
Kevin@bvalaw.net
**ATTORNEY FOR PLAINTIFF**