IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

K. K. INGRAM,

      *Plaintiff*,

v.

UNITED BIOSOURCE CORP.,

      *Defendant*.

Case No. 22-2238-EFM

**MEMORANDUM AND ORDER**

Plaintiff K. K. Ingram brings suit against Defendant United BioSource Corporation ("UBC") for wrongful termination. Plaintiff claims she is a protected whistleblower under Kansas law because Defendant terminated Plaintiff's employment only after she reported violations of state and federal law within Defendant's company. Before the Court is Defendant's Motion for Summary Judgment (Doc. 46) and Plaintiff's Motion for Partial Summary Judgment (Doc. 48). For the reasons set forth below, the Court grants Defendant's motion and denies Plaintiff's motion as moot.

**I.    Factual and Procedural Background[1]**

UBC is a contract research organization that provides support for biopharmaceutical companies including research, testing, and facilitating clinical trials. On November 28, 2011, UBC hired Ingram as an at-will employee at UBC's Overland Park, Kansas location. Her most recent job title was Senior Learning Management Systems Specialist. In this role, Ingram was

---

[1] The facts in this section are those uncontroverted from the parties' briefs, motions, attachments, or replies.

tasked with quality assurance, quality compliance tasks, and several other duties regarding UBC's learning management system. Regarding that system, Ingram was responsible for creating and deactivating user accounts, assigning training courses to employees, adding training files to employees' accounts, and pulling employee training reports.

In the fall of 2020, Ingram received a new supervisor. Following a series of complaints, accusations, and threats to quit her job spanning from the fall of 2020 to the summer of 2021, Ingram's supervisor gave her a final written warning for misconduct on July 21, 2021. This document detailed Ingram's inappropriate behavior, which included sending unprofessional emails and leaving work during regular business hours. Additionally, colleagues reported that they were unable to reach Ingram in the afternoons, and she was frequently unaware of the content discussed during staff meetings due to her midday absences.

A few weeks later, Alex Loboda replaced Ingram's old supervisor. Loboda noticed the same problems as Ingram's previous supervisor. Ingram would block off significant portions of her schedule each day and regularly leave work during normal business hours. On August 8, 2021, Loboda confronted Ingram about her schedule and asked her to change her availability. Ingram responded with a refusal to change her schedule, accusations of discrimination, and invitations to terminate her employment.

Due to its line of work, UBC is sometimes audited by current and future clients and the Food and Drug Administration ("FDA"). As such, UBC is responsible for complying with the FDA's regulations. UBC also established standard operating procedures ("SOPs") and training requirements to ensure that its employees met certain qualifications in order to continue working on specific projects.

On August 17, 2021, about a week after the exchange between Loboda and Ingram regarding her schedule, Aurinia Pharmaceuticals, a UBC client, began a routine audit of UBC. The audit included an access request for staff qualifications and training records. The next day, Loboda requested two documents from Ingram in connection with the Aurinia audit: (1) training transcripts of four employees, and (2) a UBC training matrix ("UBC Matrix") for each employee. The training transcripts that Loboda requested would have shown the four employees' completed trainings. The UBC Matrix would list the employees by role, as well as which trainings each was assigned over a certain period of time. These two documents, when taken together, would have enabled Aurinia to identify the employees' completed training as well as any training that had been assigned but not yet completed.

This request deviated from UBC's standard operating procedure which, up to that point, had been to provide the client with a SOP Matrix. The SOP Matrix would reflect both complete and incomplete courses on the same document, unlike the training transcripts and UBC Matrix which would require a client to cross reference the two documents for that same information.

Ingram had two issues with Loboda's request. First, Ingram believed that the SOP Matrix was more comprehensive because it included a complete/incomplete checklist that would allow the auditor to quickly and easily determine which employees were in or out of compliance. Ingram believed that Loboda's request—providing the auditor with one spreadsheet detailing each employee's assignments and a separate spreadsheet listing only the completed trainings—would hide from the auditor which trainings were incomplete and overdue. Ingram believed this to be fraud by omission.

Second, Ingram believed that providing dual documents as opposed to a single document would expose the training records of other UBC clients—and Aurinia competitors—to Aurinia,

information that those clients might want kept confidential. Instead, by providing only the SOP Matrix, the training information was limited to that specific client, preventing that client from viewing the training records related to another client. Ingram believed that exposing competitor client information violated UBC's internal company policies.

Less than ten minutes after Loboda emailed Ingram requesting the separate documents, Ingram copied UBC's Chief Legal Officer on the email thread and replied by accusing Loboda of "attempting to falsify records." Then, Ingram forwarded this conversation to two of the four employees from which Loboda had requested training transcripts and asked them not to provide Loboda with any of the information he had requested. To these colleagues, Ingram explained that Loboda was "attempting to falsify training records for the Aurinia audit," she had warned him that "this is fraudulent behavior," but "[h]e is not listening."

Later that day, UBC's Chief Legal Officer scheduled a call with Ingram, Loboda, and two other employees who had been included on the email threads. During the call, everyone shared their views on the matter, including Ingram who expressed her opinion that Loboda's request was improper.

The next day, on August 19, 2021, UBC's Chief Legal Officer sent Ingram an email. The email explained that, based on the information provided in Ingram's email threads and during the phone call, Loboda's "recommendation was not fraudulent" and his request "was completely appropriate." The Chief Legal Officer noted that although Loboda's request was not consistent with UBC's past practices, UBC's policies and SOPs do not specify the format in which training records must be provided to clients. Lastly, he stated that UBC takes "any allegation of fraud very seriously" and characterized Ingram's allegations as "unfounded and not constructive." Both the Safety and Risk Management Director and the Chief Human Resources Officer agreed

with the Chief Legal Officer's assessment of the issue, noting that Ingram leveled a "very serious charge . . . against a UBC worker."

On either August 19 or 20, 2021,[2] the Chief Legal Officer filed a recommendation for Ingram's termination. The paperwork described Ingram's problems with her previous supervisor leading to her final written notice, and Ingram's problems with her current supervisor, Loboda. The recommendation explained how Ingram refused to conform her schedule to normal business hours, told Loboda that he had the option of terminating her employment if her schedule would not work, inappropriately accused Loboda of fraud and falsifying records, copied several of Loboda's subordinates and colleagues on the accusations with the effect of tarnishing his reputation, and improperly told Loboda's team not to honor his requests.

The recommendation also stated that Ingram's behavior is uncooperative, repetitive, and unbeneficial the team's common goals. Further, Ingram lacks accountability for her actions, continues to display characteristics antithetical to the team's focus, and distracts others from meeting their goals with her inappropriate behavior and outbursts. As such, the Chief Legal Officer recommended Ingram face "immediate termination."

The Senior Director of Human Resources as well as Operations Leadership approved the Chief Legal Officer's recommendation. On August 20, 2021, Ingram attended a meeting with the Chief Legal Officer and the Senior Director of Human Resources who notified Ingram of her termination. A few hours later, the Senior Director of Human Resources sent Ingram a formal letter confirming her termination of employment with UBC effective that day.

Ingram filed suit against UBC for wrongful termination for whistleblowing on June 20, 2022. On June 23, 2023, UBC filed a Motion for Summary Judgment seeking a ruling in its favor

---

[2] The exact date of the following facts is immaterial.

on all claims. That same day, Ingram filed a Motion for Partial Summary Judgment seeking a ruling in her favor as to liability but reserving the matter of damages for jury determination.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[6] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[7] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[8]

## III.    Analysis

**A.     Kansas common law governs Ingram's wrongful termination claim.**

The first issue before this Court is whether Kansas or Missouri law governs Ingram's whistleblowing claim. A federal court sitting in diversity must apply the forum state's choice-of-

---

[3] Fed. R. Civ. P. 56(a).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[7] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

law rules.[9] Therefore, because this Court sits in Kansas, Kansas's choice-of-law rules determine which state's substantive law will govern Ingram's claim.[10] In tort cases, Kansas courts have long applied the traditional *lex loci delicti* choice of law rule.[11] According to this rule, the law of the state where the tort occurred governs the merits of the litigation.[12] Termination for whistleblowing is considered a common-law tort in Kansas.[13] Under these rules, Kansas law governs Ingram's wrongful discharge claim because she was terminated from her job at UBC in Kansas. As such, Ingram's wrongful discharge claim under Missouri's Whistleblower Protection Act has no legal basis, and consequently will not be addressed.

**B.     Under Kansas law, no reasonable fact-finder could conclude that Ingram has asserted a viable claim of wrongful discharge for whistleblowing.**

Ingram asserts a claim for retaliatory discharge based on whistleblowing under Kansas law. Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for "good cause, for no cause, or even for the wrong cause."[14] To prevail on a retaliatory discharge claim, an employee must demonstrate that she falls within one of the narrow exceptions to the employment-at-will doctrine.[15] One such exception is for certain whistleblowing claims.[16] As defined by Kansas courts, such a claim requires the employee to prove by clear and convincing evidence that:

---

[9] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496 (1941).

[10] *See id.*

[11] *Anderson v. Commerce Constr. Servs.*, 531 F.3d 1190, 1194 (10th Cir. 2008) (interpreting Kansas law).

[12] *Id.*

[13] *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685, 689–90 (1988).

[14] *Goodman v. Wesley Med. Ctr. LLC*, 276 Kan. 586, 589, 78 P.3d 817, 821 (2003).

[15] *Id.*

[16] *Hudson v. AIH Receivable Mgmt. Servs.*, 2012 WL 830515, at *15 (D. Kan. Mar. 9, 2012) (discussing *Fowler v. Criticare Home Health Servs.*, 27 Kan. App. 2d 869, 877, 10 P.3d 8, 15 (2000)).

> [(1)] a reasonably prudent person would have concluded the . . . employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; [(2)] the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and [(3)] the employee was discharged in retaliation for making the report.[17]

To successfully establish the first element of a retaliatory discharge claim, the "whistleblowing must be based on violations of specific and definite rules, regulations, or laws."[18] Following a subjective standard "would be both troublesome and unsettling" because discharge claims would be "based on a personal opinion of wrongdoing," effectively doing "away with the employment-at-will doctrine."[19] Rather, courts must objectively ask whether a reasonably prudent person—not the plaintiff—could conclude that the defendant's actions and requests amounted to legal violations.[20] Here, Ingram contends that UBC violated state law, federal law, and internal company policies. Thus, the Court will address each allegation in turn.

> 1. *UBC is entitled to judgment as a matter of law because no reasonably prudent person could find that UBC committed common law fraud.*

First, Ingram contends that UBC committed fraud under Kansas common law. Thus, the Court must evaluate the elements of common law fraud and determine whether a reasonably prudent person could conclude that each element of fraud has been met. To commit fraud, the defendant must (1) make an untrue statement of fact, (2) known by the defendant to be untrue, (3) with the intent to deceive or with reckless disregard for the truth, (4) upon which another party justifiably relies and acts to his or her detriment.[21]

---

[17] *Holt v. Foot Locker Retail, Inc.*, 631 F. Supp. 3d 1009, 1014 (D. Kan. 2022) (citing *Palmer*, 242 Kan. at 900, 752 P.2d at 690).

[18] *Goodman*, 276 Kan. at 591, 78 P.3d at 822.

[19] *Id.* at 592, 78 P.3d at 222–23.

[20] *See Eckman v. Superior Indus. Int'l, Inc.*, 2007 WL 1959199, at *7 (D. Kan. July 2, 2007).

[21] *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191, 1195 (2004).

Here, neither party disputes that Loboda asked Ingram for both the UBC Matrix and the training transcripts. The UBC Matrix listed the employees by role and to which training tasks they were assigned. The training transcripts showed the employees' completed training. The documents, taken together, would enable the auditor to identify any training that had been assigned but not yet completed. The only difference between Loboda's request and the UBC's standard operating procedure was the records' format.

For past audits, UBC provided its auditors with a SOP Matrix, which listed each employee's complete and incomplete training courses in the same document. Even though having to cross-reference separate documents may be less efficient than having all the information in a single document, ultimately the separate documents Loboda requested contained no false information.

Accordingly, without any proof that a UBC officer, executive, manager, or supervisor made an untrue statement of fact, this Court concludes that no reasonably prudent person could have determined that Loboda's request of Ingram amounted to common law fraud. As such, UBC is entitled to judgment as a matter of law on this issue.

> 2. *UBC is entitled to judgment as a matter of law because Ingram has failed to identify which provision of 21 C.F.R § 11 UBC violated.*

Next, Ingram alleges that UBC violated Title 21, Ch. I, Subch. A, Pt. 11 of the Federal Code of Regulations. However, 21 C.F.R § 11 is not itself a federal regulation. Rather, it is a section heading under which there are ten separate regulations.[22] These ten regulations outline the FDA's various requirements for creating, modifying, archiving, retrieving, and transmitting electronic records, signatures, and systems.[23]

---

[22] *See* 21 C.F.R §§ 11.1–11.300.

[23] 21 C.F.R § 11.1(a) (2021).

Ingram argues that Loboda's request—providing training records in a dual document format—would have violated Part 11. Specifically, she claims that completing Loboda's request required committing the "illegal act" of "altering training information on an audit requested and used for . . . compliance with FDA regulations" in "violation of 21 C.F.R § 11."

However, Ingram offers no clarification in her briefs, motions, attachments, or responses as to which of the ten regulations she accuses UBC of violating. She quotes no regulatory language, cites no provisions, and fails to explain why or how Loboda's request would have broken any part of the code. It is not the Court's responsibility to parse through 21 C.F.R § 11's various provisions to try and speculate which regulation UBC could have violated. But even it if was, none of Part 11's regulations prohibit records from being submitted in the format Loboda requested. And Ingram has failed to provide any evidence to the contrary.

"The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims."[24] Thus, the plaintiff must come forward with facts or allegations sufficient to show that the defendant's conduct violated the law.[25] As such, "[u]nsupported conclusory allegations . . . do not create a genuine issue of fact."[26]

Here, not only has Ingram failed to provide facts sufficient to show that UBC violated the law, more importantly, she has failed to identify which law UBC violated in the first place. Without that preliminary information, the Court must conclude that there is no genuine dispute of material fact. Accordingly, UBC is entitled to judgment as a matter of law on this issue.

---

[24] *L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000).

[25] *Kaul v. Stephan*, 828 F. Supp. 1504, 1512 (D. Kan. 1993) (citations and quotations omitted).

[26] *L & M Enters.*, 231 F.3d at 1287.

> *3. UBC is entitled to judgment as a matter of law because Ingram has failed to demonstrate which internal policy UBC violated and why internal policy violations legally constitute a rule, regulation, or law.*

Lastly, Ingram alleges that UBC violated internal company policies by deviating from the company's past practices and standard operating procedures. In the past, UBC has provided its auditors with a single document SOP Matrix rather than training transcripts and a UBC Matrix as separate documents. Thus, Ingram believed that providing the information in the format Loboda requested would at least violate UBC's past practices and at most constitute fraud.

Although neither party provides a copy of UBC's standard operating procedures, uncontroverted deposition testimony summarizes UBC procedure as follows:

> UBC's past practice has been to produce a report from our learning management system in response to such requests that (a) lists all courses assigned to such employee, and (b) indicates the assigned courses completed and the assigned courses not completed by such employee. UBC's policies and SOPs do not prescribed [sic] the exact form of training record to provide clients in response to training records requests.

This seems to indicate that UBC has no internal company policy specifying how employees should respond to a training records request from a client in the context of an audit. Without such a requirement, the Court finds that no internal policy violation occurred.

However, even if a reasonable person would conclude that this unconventional format request departed from UBC's standard practice for generating client reports, violations of internal policies are "insufficient to support a claim of whistleblowing."[27] This is because under Kansas law, internal policies and guidelines "do *not* qualify as rules, regulations, or the law pertaining to public health, safety, and the general welfare."[28] Thus, the whistleblowing

---

[27] *Holt.*, 631 F. Supp. 3d at 1017.

[28] *Palmerin v. Johnson Cnty., Kan. Bd. of Cnty. Comm'rs*, 524 F. App'x 431, 433 (10th Cir. 2013) (citations and quotations omitted) (emphasis in original).

exception does not extend to "failures to comply with internal company policies or procedures."[29] Rather, "[t]he reported conduct must violate the law."[30]

Therefore, the Court concludes that no reasonably prudent person could find that UBC's internal policy violation—if one ever occurred—satisfies the element of violating a rule, regulation, or law necessary for establishing a whistleblowing claim. As such, UBC is entitled to judgment as a matter of law on this issue.

In sum, Ingram has failed to establish the first element of a whistleblowing claim by clear and convincing evidence. Given the uncontroverted facts, a reasonably prudent person could not conclude that UBC was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare. As such, the Court need not evaluate the remaining elements to conclude that Ingram has failed to establish a viable claim of wrongful discharge for whistleblowing.

**IT IS THEREFORE ORDERED** that Defendant United BioSource Corporation's Motion for Summary Judgment (Doc. 46) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff K. K. Ingram's Motion for Partial Summary Judgment (Doc. 48) is **DENIED AS MOOT.**

---

[29] *Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 520 (D. Kan. 2007).

[30] *Duffey v. Bd. of Comm'rs of Butler Cnty., Kan.*, 2011 WL 1118585, at *16 (D. Kan. Mar. 25, 2011).

**IT IS SO ORDERED.**

Dated this 22nd day of November, 2023.

This case is closed.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE